In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-2009, 18-2218, 18-2286, 18-3303, and 19-1299

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

REYNOLD DE LA TORRE, *et al.*,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cr-00251-TWP-MJD — **Tanya Walton Pratt**, *Judge.*

_____

ARGUED SEPTEMBER 6, 2019 — DECIDED OCTOBER 10, 2019

_____

Before FLAUM, SYKES, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* The Zamudio drug organization dis-
tributed pounds of methamphetamine and cocaine through-
out the Indianapolis, Indiana area. At the top sat Jose
Zamudio, who imported the drugs from his suppliers in Mex-
ico and oversaw his network of distributors here. Reynold De
La Torre, Christian Chapman, Jeffrey Rush, and Adrian Ben-
nett were four of those local distributors. Maria Gonzalez was
Zamudio's live-in girlfriend. Besides permitting Zamudio to

store and traffic drugs out of her home, Gonzalez helped launder Zamudio's drug money and wired hundreds of thousands of dollars to Mexico and California.

Zamudio, Gonzalez, De La Torre, Chapman, Rush, and Bennett all eventually pleaded guilty and were sentenced to lengthy prison terms. Each separately appealed on different grounds, and we consolidated the appeals.[1] We affirm the sentences of Gonzalez, De La Torre, and Bennett. We vacate the guilty pleas of Chapman and Rush and remand for further proceedings.

## I. Factual and Procedural Background

In early 2016, federal agents began investigating the drug trafficking activities of Zamudio, along with his brother Juan Zamudio. (Because Juan Zamudio is not a party to this appeal, we use "Zamudio" to refer to Jose Zamudio.) Agents received court authorization to intercept numerous telephone calls between Zamudio and his associates. On November 17, 2016, the FBI executed approximately forty search warrants as a result of its investigation into the Zamudio organization. The warrants led to the seizure of over seventy firearms, approximately fifteen pounds of methamphetamine, smaller quantities of cocaine, heroin, and marijuana, and cash. At least eighteen individuals were indicted as part of the conspiracy.

### A. Jose Zamudio

At the top of the Zamudio organization were brothers Jose and Juan. The brothers grew up very poor in rural Mexico and eventually made their way to Indianapolis in 2008. Zamudio

---

[1] Counsel for Zamudio filed an *Anders* brief and we address Zamudio's appeal, No. 18-3361, in a separate order issued today.

worked multiple jobs while living in Indianapolis, mostly at restaurants as a dishwasher and a cook. Sometime before the FBI's investigation began in 2016, he went from working two minimum-wage jobs to leading a drug trafficking organization and overseeing the distribution of hundreds of thousands of dollars of methamphetamine.

As noted above, the FBI intercepted numerous telephone conversations between Zamudio and his drug distributors in Mexico and the United States. A search warrant was executed on Zamudio's home and the government seized 4.5 kilograms of methamphetamine, five firearms, and over ten thousand dollars in cash. Another 11 kilograms of methamphetamine were seized from Juan's home, which Zamudio and Juan used to store drugs.

Zamudio eventually pleaded guilty to four counts of the indictment that included conspiracy to distribute drugs, unlawful possession of a firearm, and conspiracy to launder money. He did so without the benefit of an agreement. The Guidelines range for Zamudio was life; he received less. Zamudio's total sentence was 380 months' imprisonment.

### B. Maria Gonzalez

Maria Gonzalez was Jose Zamudio's girlfriend. During at least a portion of the conspiracy Zamudio lived with Gonzalez and she allowed him to store and sell methamphetamine in her home. Her most prominent role in the organization, though, was laundering Zamudio's drug money. Gonzalez utilized InterCambio Express, MoneyGram, and Western Union to wire drug proceeds from Indiana to Mexico and California. But she did not just launder money herself; Gonzalez

recruited her son, his girlfriend, and his girlfriend's sister to help her by sending wires and making bank deposits.

Gonzalez pleaded guilty to one count of conspiracy to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846, and two counts of conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (h) and 1956(a)(1)(B)(i), (h). Before sentencing, the government sought to apply an aggravating role enhancement pursuant to § 3B1.1 of the Sentencing Guidelines for Gonzalez's supervisory role in the organization. Gonzalez objected to the enhancement on the ground that she did not supervise enough participants to qualify as a supervisor. But, as will become much clearer later, she misapprehended the requirements for the enhancement below and objected on an incorrect basis.

The district court overruled her objection and applied the aggravating role enhancement, which added three levels to Gonzalez's offense level for a total offense level of forty-three. With a criminal history category of I, the Sentencing Guidelines imprisonment range was a lifetime sentence. The court ultimately sentenced Gonzalez to a total term of 300 months' imprisonment. Gonzalez appeals the application of the aggravating role enhancement on a different ground than she raised below.

### C. Reynold De La Torre

Reynold De La Torre was a distributor for the Zamudio organization, receiving his methamphetamine supply from another co-conspirator within the organization. He was charged with one count of conspiracy to possess with intent to distribute and to distribute 500 grams or more of

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). De La Torre pleaded guilty to both counts in a binding plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). Under the terms of the agreement, the parties recommended a total term of imprisonment of between 180 and 195 months. The terms of supervised release and a fine amount were not agreed upon by the parties. The plea agreement did, however, waive De La Torre's right to appeal the length and conditions of supervised release.

At a combined plea and sentencing hearing, the district court informed De La Torre that it intended to impose the conditions of supervised release that were recommended by the probation officer in the presentence investigation report (PSR). De La Torre stated that he reviewed the conditions "carefully," did not have any objections, and waived a formal reading of the conditions into the record. The court then imposed the conditions of supervised release.

De La Torre now challenges two of the conditions of supervised release as vague and unconstitutional:

> [1] You shall not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, Spice, glue, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption.

> [2] You shall not be a member of any gang or
> associate with individuals who are gang mem-
> bers.

He does not, however, challenge any other portion of his sentence, including the length of the period of supervised release (five years), the term of imprisonment (180 months), or the amount of the fine ($2,000).

### D. Jeffrey Rush

While De La Torre received his methamphetamine supply from another co-conspirator within the organization, Jeffrey Rush went straight to the top and received his methamphetamine supply directly from Zamudio. In addition to selling the drugs himself, Rush also supplied Christian Chapman down the distribution line.

Rush was charged with one count of conspiracy to possess with intent to distribute and to distribute 500 grams or more of methamphetamine (mixture) and/or 500 grams or more of cocaine (mixture), in violation of 21 U.S.C. §§ 841(a)(1) and 846. The government filed an information, pursuant to 21 U.S.C. § 851(a), notifying Rush that it intended to rely upon two previous felony drug convictions to seek an enhanced sentence. Both convictions were Indiana state court convictions, one in 2001 for felony dealing in a controlled substance (the "2001 Indiana conviction") and the second in 2010 for felony possession of methamphetamine (the "2010 Indiana conviction"). The two prior felony drug convictions subjected Rush to a mandatory term of life imprisonment without release. 21 U.S.C. § 841(b)(1) (2018).

Facing life in prison, Rush opted to plead guilty in exchange for the government dropping one of the two § 851

prior felony convictions. His mandatory minimum sentence was now twenty years' imprisonment, though he agreed to a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) with a sentence of 312 to 324 months, which was within the Sentencing Guidelines range. The district court sentenced Rush to a prison term of 312 months.

On appeal, Rush argues that neither of his two prior felony drug convictions were in fact qualifying predicate offenses under § 851 and therefore he should be able to withdraw his binding guilty plea agreement because it was not knowingly and intelligently entered into.

### E. Christian Chapman

Christian Chapman received his drug supply from Rush and then redistributed the methamphetamine to his own customers. Chapman also stands in a similar procedural posture to Rush.

Chapman was indicted on one count of conspiracy to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846, and two counts of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). The government also filed a § 851 information notifying Chapman that it intended to rely on three prior felony convictions for enhanced sentencing: a 2000 conviction in Indiana for felony possession of a schedule II controlled substance (the "2000 Indiana conviction") and two 1993 convictions in Illinois for felony unlawful possession of controlled substances (together the "1993 Illinois convictions"). These prior convictions, too, meant that Chapman faced a mandatory minimum of life imprisonment. *See* 21 U.S.C. § 841(b)(1) (2018).

Like Rush, Chapman agreed to plead guilty in exchange for the government alleging only one of his three prior felony drug convictions under §§ 841 and 851. Chapman entered into a Rule 11(c)(1)(C) binding plea agreement and pleaded guilty to the one count of conspiracy to possess with intent to distribute and to distribute controlled substances. The government dismissed the remaining two counts of the indictment against Chapman and filed an amended § 851 information reflecting only the 2000 Indiana conviction. The plea agreement agreed upon a period of incarceration of 300 months. The district court accepted the plea agreement and imposed the twenty-five-year sentence.

Chapman appeals his sentence, asserting that none of his prior state court convictions qualified as predicate felony drug offenses under § 851, and thus his guilty plea was not knowing and voluntary.

**F. Adrian Bennett**

Adrian Bennett, like Rush, received his supply of methamphetamine and cocaine directly from Zamudio to then distribute. Bennett was indicted on three counts: one count of conspiracy to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846; one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1); and one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1).

He initially entered into a plea agreement, wherein he pleaded guilty to one count of conspiracy to possess with intent to distribute and to distribute controlled substances. The government filed a § 851 information notifying Bennett of its

intent to rely on one prior felony drug offense. Between the time Bennett's guilty plea was entered and his sentencing, the First Step Act of 2018 became law. *See* Pub. L. No. 115–391, 132 Stat. 5194 (Dec. 21, 2018). Title IV, Section 401 of the First Step Act precluded the prior drug offense from qualifying as a predicate offense under §§ 841 and 851. Because Bennett was then no longer subject to the enhancement, his statutory imprisonment range was significantly reduced.

At the sentencing hearing, Bennett moved to withdraw his plea agreement based on the dramatic change in circumstances. The government did not object and the district court allowed the withdrawal. After some additional discussion, Bennett decided to proceed with an open plea. Without the § 851 enhancement, the conviction carried a statutory range of ten years to life imprisonment (down from a mandatory minimum sentence of life imprisonment). The Sentencing Guidelines range was a term of 262 months to 327 months.

After the district court heard argument from defense counsel and the government, and a statement of allocution from Bennett, it imposed a below-Guidelines sentence of 225 months' imprisonment. The sentence was "based upon the defendant's remorse, his family ties, [and] his addictions," and "addresse[d] the defendant's personal history, his characteristics, as well as the serious nature of the offense, by promoting respect for the law, providing deterrence, and protecting the public." The court further explained its consideration of the § 3553(a) factors in arriving at the below-Guidelines sentence.

Bennett appealed his sentence as unreasonable.

## II. Discussion

We address each defendant in turn, and Chapman and Rush together to the extent their arguments overlap.

### A. Gonzalez's aggravating role enhancement

Gonzalez objected in the court below to the application of the aggravating role adjustment to her offense level, but she did so on a different basis than she presents now on appeal. Section 3B1.1 of the Sentencing Guidelines provides that the sentencing judge shall increase the defendant's offense level based on whether the defendant played an "aggravating role" in committing the offense. An aggravating role is an "organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 n.2. Relevant here, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," the offense level is increased by three. U.S.S.G. § 3B1.1(b). Before the district court, Gonzalez argued that she did not manage or supervise five or more participants—only three: her son, her son's girlfriend, and the girlfriend's sister. Gonzalez, however, conflated the requirement for the size of the criminal activity overall—"five or more participants or otherwise extensive"—with the requirement for the number of participants in the criminal enterprise that the defendant had to manage or supervise—"one or more other participants." *Compare* § 3B1.1(b), *with* § 3B1.1 n.2.[2] Gonzalez now argues that none of the three alleged supervisees qualify as a "participant" under the Guidelines.

---

[2] Despite Gonzalez's initial confusion, she no longer disputes that the Zamudio drug trafficking enterprise involved five or more participants.

Gonzalez advances this basis for her sentencing objection for the first time on appeal, and thus forfeited the argument. It is a completely different argument than the one she presented to the district court, and she denied the judge the opportunity to address the argument. Consequently, our review of the district court's application of the Guidelines is for plain error only. *See United States v. Harris*, 791 F.3d 772, 779 (7th Cir. 2015); *United States v. Hawkins*, 480 F.3d 476, 478 (7th Cir. 2007). To prevail under plain error, Gonzalez must show that "(1) an error occurred, (2) the error was plain, (3) it affected the defendant's substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the proceedings." *United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019).

For a defendant to receive an offense-level enhancement for being a supervisor of one or more participants, the participant must be "criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 n.1. The participant need not have been charged either, as long as "the participant *could have* been charged." *United States v. Pabey*, 664 F.3d 1084, 1097 (7th Cir. 2011). A participant is criminally responsible under § 3B1.1 if he or she knowingly assisted the criminal enterprise. *Id*. Mere knowledge of the conspiracy, however, is not enough.

The record sufficiently supports a finding that at minimum Gonzalez's son, whom she trusted, knowingly assisted his mother in laundering money. In her post-*Miranda* statements, Gonzalez told agents that initially her son refused to wire transfer money for her. After she asked him again, he agreed, but told her he would only do it the one time. A total of four wire transfers were made in his name. Gonzalez also recruited her son's girlfriend, who made nine wire transfers

and six separate bank deposits at Gonzalez's direction. *See United States v. Watts*, 535 F.3d 650, 660 (7th Cir. 2008) (aggravating role enhancement applied to a defendant who recruited his wife to participate in bank fraud conspiracy based on findings that the wife opened a bank account using false information and attempted to deposit check from co-conspirator). Importantly, Gonzalez never contested any of these factual allegations.

Those facts were also set forth in the PSR. Gonzalez objected to the application of certain enhancements and related underlying facts (such as the fact that she possessed a gun), but did not object to the facts concerning the roles of her son, his girlfriend, and his girlfriend's sister in the money laundering scheme. To the contrary, at sentencing, Gonzalez argued that she supervised only these *three* people, not five people—that is more than the "one or more" participants the Guidelines require for the aggravating role enhancement. In overruling Gonzalez's objection, the district court expressly stated that "[Gonzalez] was the manager and supervisor of three."

There was no error in the district court's application of the aggravating role enhancement, and certainly not one that was plain. We affirm Gonzalez's sentence.

## B. De La Torre's conditions of supervised release

We have recently clarified our law regarding forfeiture versus waiver of challenges to conditions of supervised release made for the first time on appeal. *See United States v. Flores*, 929 F.3d 443, 450 (7th Cir. 2019); *United States v. Hunt*, 930 F.3d 921, 924 (7th Cir. 2019) (discussing our decision in *Flores*). The *Flores* decision came out after briefing was

submitted in this appeal,[3] but the law is now clear in this circuit. We will find challenges to supervised release conditions waived when

> the defendant has notice of the proposed conditions, a meaningful opportunity to object, and she asserts (through counsel or directly) that she does not object to the proposed conditions, waives reading of those conditions and their justifications, challenges certain conditions but not the one(s) challenged on appeal, or otherwise evidences an intentional or strategic decision not to object.

*Flores*, 929 F.3d at 450.

De La Torre waived his challenge. He was on notice of the now-challenged conditions since the disclosure of the initial PSR, which proposed both conditions verbatim. He did not file any objections. Any doubt that De La Torre did not have sufficient advance notice of the challenged conditions was erased at sentencing. Counsel told the sentencing judge that De La Torre "carefully" reviewed the proposed conditions and had no objections, and then waived a formal reading. De La Torre had ample opportunity to raise objections to any conditions that he knew could be imposed and passed on that chance. We are satisfied from the record that De La Torre

---

[3] In light of our circuit's recent decisions, De La Torre's appellate counsel moved to waive oral argument and cede his time to the remaining co-defendants. We permitted counsel to appear by telephone and nonetheless gave counsel the opportunity to make and respond to any arguments on behalf of De La Torre.

intentionally waived his appellate challenge to the conditions of supervised release.

**C. Chapman's and Rush's predicate felony drug offenses**

Chapman and Rush challenge the validity of their guilty pleas based on perceived errors in the applicable mandatory minimum sentences. For both defendants, the government filed an information pursuant to 21 U.S.C. § 851(a) alleging that prior state law convictions were each a "felony drug offense" under 21 U.S.C. § 841. As a result of the § 851 enhancements, Chapman and Rush each faced mandatory minimums of life in prison. Both opted to reach a plea agreement in exchange for the government amending the § 851 information to allege only one prior felony drug conviction, which lowered the mandatory minimum sentence. Because, they argue, their plea agreements were based on errors regarding the mandatory minimum sentences they would have otherwise faced, the guilty pleas were not entered into knowingly and intelligently and should be vacated. There is no contention that either Chapman or Rush objected to the predicate offenses or requested that the district court vacate their pleas, and thus our review is for plain error. We ultimately agree that there was an error and it affected their substantial rights, and thus vacate both Chapman's and Rush's plea agreements and remand for further proceedings.

*1. Predicate felony drug offenses*

Section 841(b)(1)(A), the applicable penalty provision for Chapman's and Rush's federal convictions, provided at that time for a ten-year mandatory minimum sentence that increased to a mandatory minimum term of imprisonment of twenty years if the defendant was convicted "after a prior

conviction for a felony drug offense." 21 U.S.C. § 841(b)(1)(A) (2018). The term "felony drug offense" is defined in 21 U.S.C. § 802(44) to mean:

> an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances.

*See Burgess v. United States*, 553 U.S. 124, 126 (2008) ("The term 'felony drug offense' contained in § 841(b)(1)(A)[] … is defined exclusively by § 802(44) …."). Each of the four categories of covered drugs is also defined in § 802. *See* 21 U.S.C. § 802(17) (defining "narcotic drugs"); *id*. § 802(16) (defining "marihuana"); *id*. § 802(41)(A) (defining "anabolic steroid"); *id*. § 802(9) (defining "depressant or stimulant substance"). The government filed an information identifying the prior convictions pursuant to 21 U.S.C. § 851(a).

We must, then, determine whether Chapman's or Rush's prior convictions under state law meet the federal definition of "felony drug offense." To do so, we apply the categorical approach, which requires us to compare the elements of the state statute of conviction to the elements of the federal recidivism statute. *United States v. Elder*, 900 F.3d 491, 501 (7th Cir. 2018). If, and only if, the elements of the state law mirror or are narrower than the federal statute can the prior conviction qualify as a predicate felony drug offense. *Id*. Importantly, under the categorical approach, it is only the elements that matter, not the defendant's underlying conduct.

### 2. *Chapman's Illinois convictions*

We begin with Chapman's two 1993 Illinois convictions because, although the Illinois convictions were not relied upon as prior felony drug offenses under §§ 841(b)(1)(A) and 851 for purposes of his binding plea agreement, all parties now agree that these convictions do not qualify as predicate offenses and the error requires vacating the plea agreement.

Chapman has two convictions for felony unlawful possession of controlled substances in violation of 720 ILCS 570/402(c) (1993). Subsection (c) is a broad residual provision that applies to the possession of "a controlled or counterfeit substance not set forth in subsection (a) or (d)." *Id*. The Illinois statute defines "controlled substance" as "a drug, substance, or immediate precursor in the Schedules of Article II of this Act." 720 ILCS 570/102(f). The Schedules, in turn, are found at 720 ILCS 570/204 (Schedule I), *id*. § 206 (Schedule II), *id*. § 208 (Schedule III), *id*. § 210 (Schedule IV), and *id*. § 212 (Schedule V).

The government first filed a § 851 information identifying three prior convictions—these two 1993 Illinois convictions and the 2000 Indiana conviction—that increased Chapman's statutory minimum sentence to life in prison. The government agreed to withdraw the § 851 information as to the two Illinois convictions, reducing Chapman's mandatory minimum sentence to twenty years in prison, if Chapman pleaded guilty. Chapman reluctantly accepted and pleaded guilty.

Two of our recent decisions bear directly on the outcome of Chapman's appeal. Shortly after Chapman pleaded guilty and was sentenced, we held in *Elder* that an Arizona statute that included propylhexedrine was mismatched with the

federal definition of felony drug offense under § 802(44), which does not cover propylhexedrine. *Elder*, 900 F.3d at 501. Because in 1993 the Illinois schedules listed propylhexedrine as a Schedule V controlled substance, s*ee* 720 ILCS 570/212(d) (1993), it follows that Illinois's § 402(c) is also categorically broader than the federal definition of a felony drug offense. The government did not contest this point, but instead argued that the Illinois statute was divisible and thus we could look to the elements of Chapman's actual convictions.

After the briefing was submitted in this appeal, we decided *Najera-Rodriguez v. Barr*, 926 F.3d 343 (7th Cir. 2019), which held that 720 ILCS 570/402(c) is not divisible. In light of this holding, the government conceded at oral argument that Chapman's Illinois convictions do not qualify as prior felony drug offenses for purposes of the § 851 enhancement. Accordingly, the government agreed that this error affected Chapman's substantial rights and that his plea agreement must be set aside.

### 3. *Chapman's guilty plea*

We accept the government's concession that Chapman's plea agreement should be vacated, and offer a brief explanation.

Chapman, the government, and the sentencing judge all erroneously believed that Chapman's multiple prior convictions subjected him to a mandatory life sentence. The record is abundantly clear that Chapman only agreed to the plea agreement because he believed life in prison was his only alternative. That was not true.

Without those two prior Illinois convictions, and assuming for the moment that his 2000 Indiana conviction was a

qualifying predicate felony drug offense, Chapman's mandatory minimum immediately dropped from life to twenty years' imprisonment. *See* 21 U.S.C. § 841(b) (2018). Yet Chapman agreed to a binding term of imprisonment of twenty-five years—a far greater prison sentence than he could have been sentenced to without any plea agreement at all. And this is all notwithstanding the presence of his 2000 Indiana conviction, the absence of which would cut his mandatory minimum term of incarceration in half, down to ten years. *See* 21 U.S.C. § 841(b) (2018).

Chapman has met his burden of showing that the error regarding the use of the 1993 Illinois convictions as prior felony drug offenses was prejudicial. *See United States v. Olano*, 507 U.S. 725, 734 (1993). An error such as the one we have here "establishes a reasonable probability that a defendant will serve a prison sentence that is more than 'necessary' to fulfill the purposes of incarceration." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018) (holding that a plain error in calculating the correct Guidelines range affected the defendant's substantial rights and warranted relief). Chapman's sentencing transcript reflects more than a reasonable probability of additional jail time. In accepting the binding plea agreement, the sentencing judge expressed concern over the length of the sentence and stated that it was "difficult to find that this 300-month sentence of imprisonment is not greater than necessary." Without correction of this error, Chapman may be unnecessarily deprived of his liberty and may spend more time in jail than necessary, which we find "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (brackets omitted).

### 4. Rush's 2001 Indiana conviction

The government's initial § 851 informations identified three Indiana convictions as prior felony drug offenses: Rush's 2001 Indiana conviction for dealing in a schedule I, II, or III controlled substance; Rush's 2010 Indiana conviction for possession of methamphetamine; and Chapman's 2000 Indiana conviction for possession of a controlled substance.[4] We start with Rush's 2001 Indiana conviction because it is dispositive.

Rush was convicted in 2001 of dealing in a schedule I, II, or III controlled substance in violation of Indiana Code § 35-48-4-2 (2000). That statute provides, in pertinent part, that:

> A person who:
>
>> (1) knowingly or intentionally:
>>
>>> (A) manufactures;
>>>
>>> (B) finances the manufacture of;
>>>
>>> (C) delivers; or

---

[4] Because we already vacated Chapman's plea agreement based on the disqualified 1993 Illinois convictions, we do not reach his 2000 Indiana conviction that was relied upon for purposes of the plea. The analysis of the 2000 Indiana conviction for possession of a controlled substance under Indiana Code § 35-48-4-7 would largely track the analysis of Rush's 2001 Indiana conviction due to the significant similarities between the two statutes with respect to their coverage of controlled substances. As we will see next, Rush's 2001 Indiana conviction is not a qualifying predicate felony drug offense. Without deciding the question, we think it is unlikely that Chapman's 2000 Indiana conviction qualifies as a predicate felony drug offense, though we leave it to the parties and the court to appropriately address on remand as necessary.

> (D) finances the delivery of;
>
> a controlled substance, pure or adulterated, classified in schedule I, II, or III, except marijuana, hash oil, or hashish; or
>
> > (2) possesses, with intent to:
> >
> > (A) manufacture;
> >
> > (B) finance the manufacture of;
> >
> > (C) deliver; or
> >
> > (D) finance the delivery of;
>
> a controlled substance, pure or adulterated, classified in schedule I, II, or III, except marijuana, hash oil, or hashish;
>
> commits dealing in a schedule I, II, or III controlled substance ….

Ind. Code § 35-48-4-2(a) (2000). The schedule I, II, and III controlled substances are found at Indiana Code §§ 35-48-2-4, 35-48-2-6, and 35-48-2-8, respectively.

To demonstrate the overbreadth of the Indiana statute, Rush points to methamphetamine in schedule II. There, schedule II lists "[m]ethamphetamine, including its salts, isomers, and salts of its isomers." Ind. Code § 35-48-2-6(d)(2). The federal statute similarly controls "methamphetamine, including its salts, isomers, and salts of isomers." *See* 21 U.S.C. § 812, Schedule II(c), Schedule III(a)(3). A seeming match. But a closer look reveals otherwise.

The federal Controlled Substances Act also specifically defines the term "isomer" to mean "the optical isomer," except as used in schedule I(c) and schedule II(a)(4), where isomer

means "any optical, positional, or geometric isomer." 21 U.S.C. § 802(14). Methamphetamine is not listed in schedule I(c) or schedule II(a)(4) and thus, for purposes of federal drug offenses, methamphetamine includes only its optical isomers.

The Indiana Code, on the other hand, does not define the term "isomer." "In Indiana, the lodestar of statutory interpretation is legislative intent, and the plain language of the statute is the 'best evidence of ... [that] intent.'" *Estate of Moreland v. Dieter*, 576 F.3d 691, 695 (7th Cir. 2009) (quoting *Cubel v. Cubel*, 876 N.E.2d 1117, 1120 (Ind. 2007)); *see also Johnson v. State*, 87 N.E.3d 471, 472 (Ind. 2017) ("Our first task when interpreting a statute is to give its words their plain meaning by considering the text and structure of the statute."). Ascertaining the "ordinary" meaning of isomer might be a fool's errand, but it is not one we must undertake here. A statute "should be examined as a whole, avoiding both excessive reliance on strict literal meaning and selective reading of individual words." *Estate of Moreland*, 576 F.3d at 695 (quoting *Cubel*, 876 N.E.2d at 1120). The structure of Indiana's Controlled Substances Act guides the conclusion in this case.

When Indiana intended to limit the specific isomer for a drug, it expressly did so. Indiana's schedule II controls "[a]mphetamine, its salts, optical isomers, and salts of its optical isomers." Ind. Code § 35-48-2-6(d)(1) (2000). Elsewhere, schedule III lists certain stimulants and in the preamble notes that each substance "includ[es] its salts, isomers (whether optical, position, or geometric), and salts of such isomers." Ind. Code § 35-48-2-8(b) (2000). The Indiana legislature knew how to limit a listed drug to include only its optical isomers. It is a general rule of statutory construction that "when the

legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004). According to Rush, then, Indiana's generic use of "isomer" in relation to methamphetamine *must* be broader than optical isomers. We agree. Because the federal definition of methamphetamine includes only its optical isomers whereas the Indiana definition includes something more than just optical isomers of methamphetamine, the mismatch renders the Indiana statute overbroad.

The government does not contest that Indiana's statute, on its face, is broader than federal law, but contends that geometric isomers of methamphetamine do not exist in the real world, and thus the statutes actually mirror each other. The government's argument suffers a few fatal flaws at this juncture. First, the government asks us to take judicial notice of two expert declarations from different cases in different courts that discuss the isomer forms of methamphetamine. These declarations were not before the district court and are not the proper subject of judicial notice. The Federal Rules of Evidence permit a court to take judicial notice of a fact that is "not subject to reasonable dispute" because it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The isomeric nature of methamphetamine is not "generally known," at least to us. Nor are the declarations incontrovertible—the declarants were not subjected to *Daubert* challenges, cross-examined, or tested with competing expert testimony. None of the defendants had the ability

to challenge these declarations in the district court.[5] Second, the declarations were crafted in other cases with an eye towards the issues at hand in those cases. It seems, for example, that the declarations are primarily focused on proving that geometric isomers of methamphetamine do not exist because the state statute specifically included both optical and geometric isomers of methamphetamine. For our purposes, the declarations do not tell us whether any other types of isomers of methamphetamine could possibly exist. That issue is the heart of the dispute here. In short, the content of the declarations is "arguably subject to reasonable dispute and therefore not a proper subject of judicial notice." *Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018). Finally, notwithstanding the declarations, we do not think that the government's theoretical challenges are pertinent here when the plain language chosen by the Indiana legislature dictates that the Indiana statute is categorically broader than the federal definition of felony drug offense.

No matter, our decision is not solely dependent on the definition of methamphetamine and which of its isomers do or do not exist. Indiana Code § 35-48-4-2 reaches at least two other substances that are not included in § 802(44). Specifically, Indiana lists "[p]arahexyl" as a schedule I drug and a "combination product containing tiletimine and zolazepam (Telazol)" as a schedule III drug. Ind. Code §§ 35-48-2-4(d)(16), 35-48-2-8(c)(12) (2000). Neither substance is covered

---

[5] Granted, Rush and Chapman did not challenge their prior convictions below, which deprived the government of the opportunity to introduce this evidence in the district court. Our opinion takes no position on the scientific merits, nor should it be read as limiting the government's ability to present such an argument in future proceedings.

under the definitions in § 802(44). To put it succinctly, Rush could have been convicted under § 35-48-4-2 for dealing in a controlled substance that would not be a felony drug offense under § 802(44). The Indiana law is categorically broader.

Rush's 2001 Indiana conviction for dealing in a schedule I, II, or III controlled substance cannot serve as a predicate felony drug offense under § 841(b)(1)(A) and § 802(44).

### 5. *Rush's guilty plea*

Having found that Rush's 2001 Indiana conviction does not qualify as a predicate felony drug offense, this error clearly affected Rush's substantial rights. If Rush had known that his 2001 Indiana conviction was not a qualifying felony drug offense, it would have changed the calculus and he likely would have proceeded differently. Without two prior felony drug offenses, Rush did not face a potential mandatory minimum life sentence and instead would have been sentenced in consideration of a Guidelines range of 262 to 327 months' imprisonment.[6] The binding plea agreement called for a sentence in the middle of that range, 312 months, which the court imposed. In doing so, the sentencing judge noted that the 312-month term of imprisonment "might be greater than necessary" but that it was "the minimum the [c]ourt [could] give the defendant" because of the plea agreement.

Although Rush received a within-Guidelines sentence—otherwise presumed reasonable on review—given the facts and the sentencing judge's statements in the record, Rush has

---

[6] Even with only one prior felony conviction, such as the 2010 Indiana conviction, Rush would have been subject to a mandatory minimum term of imprisonment of ten years, or less than his Guidelines range. *See* 21 U.S.C. § 841(b) (2018).

met his burden under the plain error standard. He has shown a reasonable probability that, but for the error regarding the 2001 Indiana conviction, the outcome of the proceeding may have been different and that he may have received less prison time absent the error. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016). "Any amount of actual jail time is significant and has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration." *Rosales-Mireles*, 138 S. Ct. at 1907 (cleaned up). That error, affecting Rush's fundamental rights, left uncorrected would undermine the integrity and fairness of judicial proceedings.[7]

Not every error relating to a plea agreement will demand correction under plain error. But based on the facts of this case, Rush has satisfied his burden. We, therefore, vacate Rush's plea agreement and remand to the district court for further proceedings.

## D. Reasonableness of Bennett's below-Guidelines sentence

Our final co-defendant in this appeal, Adrian Bennett, appeals his below-Guidelines sentence of 225 months' imprisonment as unreasonable. "We review a district court's choice of sentence in two steps. First, we assess de novo whether the

---

[7] We do not need to address Rush's 2010 Indiana conviction because the inclusion of the 2001 Indiana conviction as a qualifying predicate offense is a plain error that requires remand. We note, however, that Rush treated the definition of methamphetamine as identical between Indiana Code §§ 35-48-4-6.1 and 35-48-4-2. We are not convinced that that assumption is correct, but the government did not raise the argument that different definitions of methamphetamine applied to the two sections, and thus likely waived the argument on appeal. Regardless, we do not need to decide the issue.

court followed proper procedures. If the decision below is procedurally sound, then we ask whether the resulting sentence is substantively reasonable." *United States v. Mbaye*, 827 F.3d 617, 622 (7th Cir. 2016) (quoting *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015)). Whether the sentence imposed is inside or outside the Guidelines range, we review the sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). "A below-guidelines sentence, like a within-guidelines one, is presumed reasonable against a defendant's challenge that it is too high." *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009). A defendant can only rebut this presumption of reasonableness "by showing that the sentence does not comport with the factors outlined in 18 U.S.C. § 3553(a)." *United States v. Patel*, 921 F.3d 663, 672 (7th Cir. 2019) (quoting *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018)).

Bennett does not identify any procedural errors. Nor could he. The district judge's sentencing was procedurally sound. The judge correctly calculated his Guidelines range, considered all of the § 3553(a) factors, and adequately explained the reasons for the sentence. The district court then sentenced Bennett to 225 months of incarceration, thirty-seven months below the low end of his Guidelines range of 262 to 327 months' imprisonment. Our only task, then, is to review whether the district court abused its discretion in sentencing Bennett to 225 months in prison, below the Guidelines range. It did not.

On appeal, Bennett simply attempts to reargue the § 3553(a) factors, and makes substantially the same arguments he did below. But the district court considered all of Bennett's arguments at sentencing and took them all into

account in crafting an appropriate sentence. It is not our job to reweigh the § 3553(a) factors. For example, Bennett argues that his sentence creates an unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a)(6). But other than giving the average sentence for a drug trafficking offense in the Southern District of Indiana and nationally across the United States, Bennett provides nothing more. As the district court stated at sentencing, Bennett distributed significant quantities of methamphetamine and cocaine throughout Indianapolis and the surrounding communities. The harmful effects of his conduct cannot go understated.

The district judge imposed a sentence that addressed Bennett's personal history and characteristics, reflected the seriousness of the offense, and was sufficient, but not greater than necessary. In sum, Bennett fails to identify a specific reason to question the substantive reasonableness of his below-Guidelines sentence. A below-Guidelines sentence will almost never be unreasonable, *United States v. Trudeau*, 812 F.3d 578, 594 (7th Cir. 2016), and it was not here. Bennett's sentence is affirmed.

*  *  *

We AFFIRM the sentences of Gonzalez, De La Torre, and Bennett, and we VACATE Chapman's and Rush's guilty pleas and REMAND for further proceedings.