In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2129

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SEVON E. THOMAS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:17-cr-13 — **Tanya Walton Pratt**, *Judge.*

ARGUED JUNE 1, 2020 — DECIDED AUGUST 14, 2020

Before RIPPLE, WOOD, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Sevon Thomas found himself charged with possessing a firearm in connection with a drug trafficking crime after he agreed to sell methamphetamine to a government cooperator. Once Thomas drove to the prearranged delivery time and place, the police arrested him and searched his car. When police opened the glove compartment, out fell two firearms and a bag of methamphetamine. At trial Thomas claimed that he used the guns for lawful purposes

unrelated to drug dealing and therefore did not possess them "in furtherance of" a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). A jury disagreed and found Thomas guilty. On appeal Thomas argues that the district court made two errors at trial: improperly admitting so-called "dual-role" (both expert and lay) testimony from a federal agent and bungling the jury instructions. But Thomas raised neither challenge below, so he had to show a plain error necessitating reversal of his conviction. He falls short, so we affirm.

**I**

Sevon Thomas came to the attention of law enforcement through a government informant. At the police's direction, the informant called and ordered several ounces of methamphetamine from a source known as "Eric." After arranging for delivery, the informant told law enforcement that Eric would bring the drugs to a McDonald's in Georgetown, Indiana, in a black Chevy Impala with Kentucky plates. Sure enough, the delivery took place as planned, and the driver turned out to be Sevon Thomas. The police arrested Thomas and searched his car. When a detective opened the glove compartment, 160 grams of methamphetamine and two guns fell out.

A grand jury charged Thomas with possessing with the intent to distribute methamphetamine (21 U.S.C. § 841(a)(1) – Count 1) and possessing a firearm in connection with a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)(i) – Count 2). Thomas proceeded to a jury trial, where he admitted that the drugs and guns were his. He urged acquittal on the firearm charge on the basis that he possessed the guns for the lawful purpose of personal protection and thus not in connection with his peddling of methamphetamine as required for conviction. See 18 U.S.C. § 924(c)(1)(A)(i). Seeking to refute any

nexus between the guns and the drugs, Thomas and his girl-friend both testified that he had a concealed carry permit. His girlfriend added that he stored the guns in his car to keep them out of the house and away from their two children.

For its part, the government attempted to prove that Thomas had the guns to further his drug dealing by introducing the testimony of FBI Special Agent Paul Meyer. The government seemed to call Meyer as a lay witness, not an expert. Yet on direct examination Meyer nevertheless drew on his training and experience to offer expert testimony in the form of an opinion about the connection between gun possession and drug dealing. Meyer told the jury that "a firearm is a tool of the drug trade" that drug dealers use "for personal protection against others in that particular business, whether it's to protect the drug proceeds that they may have on them or a combination of drug proceeds or drugs, the supply of drugs that they may be dealing at the time." He added that a gun could also be used "for intimidation" because a customer who knows a drug dealer is armed "may be more apt to pay his bill."

The government then questioned Meyer about his knowledge of Thomas's case, most of which he had learned from the agent who searched Thomas's car:

Q: And in this case, were there firearms found?

A: Yes, ma'am, there was.

Q: Okay. Were they—were the firearms found in a locked case?

A: No, they were not.

Q: Where were the firearms found in relation to the methamphetamine?

A: They were co-located with the methamphetamine. As reported to me, they had been in the glove box. However, when the glove box fell open, they had fallen on the passenger side floorboard area.

Q: And were both firearms loaded?

A: They were.

Thomas never objected to any aspect of Meyer's testimony.

During closing arguments, the prosecutor relied on Meyer's testimony to establish a connection between the guns and the drugs. She argued to the jury that Thomas had guns "[b]ecause he's a drug dealer." She then added, "You heard from Special Agent Meyer that drugs and guns go hand in hand and they're dangerous. Where does the defendant do his drug deals? Not at his house. He does them at his car."

After closing arguments, the district court turned to the jury instructions. A superseding indictment had charged Thomas with violating 18 U.S.C. § 924(c)(1)(A)(i), which imposes a five-year minimum sentence on "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." By its terms, then, § 924(c)(1)(A)(i) can be violated in three ways: by (1) possessing a firearm in furtherance of a drug trafficking crime, or by (2) using or (3) carrying a firearm during and in relation to such a crime. See *United States v. Haynes*, 582 F.3d 686, 704 (7th Cir. 2009) (abrogated on other grounds).

At trial the government sought to prove the § 924(c) count by focusing on only the first way of violating the statute—by showing that Thomas "possesse[d]" the guns "in furtherance of" a drug crime. The trial court so instructed the jury, explaining that a conviction on Count 2 required finding beyond a reasonable doubt that Thomas (1) possessed methamphetamine with the intent to distribute it, and (2) knowingly possessed a firearm (3) in furtherance of the methamphetamine possession. In conveying this instruction, the district court did not define or otherwise explain what it meant for the gun possession to be "in furtherance of" possession of the methamphetamine. But the district court did define "carry," "during," and "in relation to"—terms Congress used in parts of § 924(c) but that were not any part of the government's approach to proving Count 2. Here, too, Thomas lodged no objection.

The jury returned guilty verdicts on Counts 1 and 2, and the district court sentenced Thomas to a total of 15 years' imprisonment—ten years for the drug charge plus five consecutive years for the firearm offense.

On appeal Thomas contends that the district court failed to follow the correct procedures for admitting Special Agent Meyer's testimony because it included both expert and lay opinions and thus amounted to "dual-role" testimony. Thomas also argues that the jury instructions confused and misled the jury by omitting any definition of the statutory "in furtherance of" requirement but including definitions of statutory terms not relevant to the precise § 924(c) charge in Count 2. Together, Thomas says, these errors warrant reversal of his conviction on the Count 2 § 924(c) gun offense.

**II**

We start with the admission of FBI Special Agent Paul Meyer's testimony. Ordinarily we review a district court's decision to admit testimony for an abuse of discretion. See *United States v. Parkhurst*, 865 F.3d 509, 514 (7th Cir. 2017). We apply a more deferential standard here, though, because Thomas never objected to Meyer's testimony during trial. In these circumstances, Thomas needs to show that the admission of the testimony amounted to plain error—an error so profound that it compromised Thomas's substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *United States v. Olano*, 507 U.S. 725, 736 (1993); see also *United States v. Resnick*, 823 F.3d 888, 896 (7th Cir. 2016) (applying the same standard).

Thomas focuses on the difference between lay and expert testimony. "[L]ay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." FED. R. EVID. 701 advisory committee note on 2000 amendments (internal quotations omitted). Lay testimony may be admitted if it is based on personal knowledge and helpful to determining a fact in question. See FED. R. EVID. 701. Meanwhile, to admit expert testimony, a district court must first ensure that the witness is qualified to offer the opinion at issue. See FED. R. EVID. 702. A district court should admit expert testimony only if it will help the factfinder understand the evidence, finds support in sufficient facts or data, and reflects the product of reliable methods or principles, reliably applied to the facts of the case. See *id*.

Sometimes a witness offers both lay and expert testimony—what the case law calls "dual-role" testimony. See

*United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018). Imagine an engineer who testifies in a products liability case. The engineer may give lay testimony from firsthand involvement designing a consumer product—say, a lawn mower—alleged to be defective. The same engineer may also be qualified to give an expert opinion about the design of a competitor's product—for example, testimony about the alternative design of the shutoff handle on a competitor's mower.

The setting here is law enforcement. All agree that Special Agent Meyer provided both lay and expert testimony at Thomas's trial. Meyer testified that, "[a]s reported to [him]," the firearms found in Thomas's car were loaded and "co-located with the methamphetamine"—lay testimony based not on his specialized knowledge but instead on his personal familiarity with the case. Earlier in the questioning, though, the government asked Meyer to offer a view "[b]ased upon [his] training and experience" about the connection between gun possession and drug dealing. He replied that firearms are "tool[s] of the drug trade" used "for personal protection" and "intimidation." This description fits squarely within the type of specialized knowledge—in this case rooted in a law enforcement officer's experience investigating drug offenses over many years—that Federal Rule of Evidence 702 considers expert testimony.

Our case law emphasizes the care district courts must take in admitting dual-role testimony. We most recently underscored the point in *United States v. Jett*, explaining that the admission of dual-role testimony, while permissible, risks confusing the jury. See 908 F.3d at 267 (collecting cases). More concretely, a jury "may unduly credit the [case agent's] opinion testimony due to a perception that the expert was privy to

facts about the defendant not presented at trial" or "may be smitten by an expert's aura of special reliability." See *id.* (internal quotations omitted). And where the officer provides expert testimony about criminal methods, as Special Agent Meyer did here, juries should be cautioned "that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes." *United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir. 1994).

Sound trial procedure helps mitigate these risks. Foremost, the district court should "encourage the government to present the expert and lay testimony separately" because the risk of confusion is greater for "[a] witness who careens from one type of testimony to the other." *Jett*, 908 F.3d at 269. When the expert portion of an agent's testimony begins, the court should "allow the government to lay its foundation and establish the agent's qualifications," then "instruct the jury that the testimony it is about to hear is the witness's opinion based on training and experience, not firsthand knowledge, and that it is for the jury to determine how much weight, if any, to give that opinion." *Id.* at 269–70.

Here the district court did not follow the procedures we outlined in *Jett*. That almost certainly happened because the government failed to adhere to its obligation to identify Meyer as an expert in advance of trial. See FED. R. CRIM. P. 16(a)(1)(G). Nor did the district court take affirmative steps to vet Meyer's qualifications and opinion once it was clear that he would offer expert testimony. See *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (explaining that before admitting expert testimony the district court "must determine whether the witness is qualified" (internal quotations

omitted)); see also FED. R. EVID. 702 (describing an expert witness as one qualified "by knowledge, skill, experience, training, or education"). We have consistently emphasized that the district court must fulfill this gatekeeping responsibility. See *United States v. Tingle*, 880 F.3d 850, 854 (7th Cir. 2018). Equally important is the district court's duty to limit the risk of jury confusion when admitting dual-role testimony. See *Jett*, 908 F.3d at 269–70.

But the district court's error in Thomas's trial was not plain and so does not warrant reversal. Had the government disclosed and offered Special Agent Meyer as an expert, his testimony would have been unobjectionable. Meyer testified that he had 23 years' experience in law enforcement, including with firearms and drug trafficking crimes. He had the requisite qualifications to inform the jury, based on his training and experience, how and why drug dealers often possess and use firearms. It is well-established that such testimony falls into the category of specialized knowledge (and thus expert opinion) and can help a jury determine whether a defendant like Thomas possessed a gun in furtherance of a drug crime. See *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) ("The average juror does not know how a drug business is run, and to that extent [a law enforcement expert's] testimony was useful in showing the link between crack and guns." (internal citations omitted)).

Even setting aside Meyer's testimony, the government had ample evidence to show that Thomas was using the firearms found in his car to facilitate his drug dealing. Detective Stephen Coleman testified at trial and explained the search he conducted of Thomas's car. He described opening the glove compartment only to see two guns and a significant amount

of methamphetamine fall out. On these facts we have little dif-
ficulty seeing how the gun possession could have furthered
Thomas's drug dealing: the guns and drugs were stored to-
gether and both were within arm's reach of the driver—
Thomas—who had driven to a pre-arranged location to de-
liver methamphetamine.

We reached a similar conclusion in *Jett*, even though our
review there was merely for an abuse of discretion. See 908
F.3d at 265. The district court did not follow the proper pro-
cedures for admitting dual-role testimony, but we neverthe-
less held that the error was harmless given the strength of the
government's case. See *id*. at 270.

We follow suit here. Not only was the evidence against
Thomas substantial, but he bears the more demanding bur-
den of showing plain error to boot. On the evidence presented
at trial, we cannot say that the district court's handling of Spe-
cial Agent Meyer's dual-role testimony amounted to plain er-
ror under the demanding standard the Supreme Court an-
nounced in *Olano*. See 507 U.S. at 736.

### III

Thomas next challenges the jury instructions on Count 2.
In the ordinary course we review a district court's decision to
give a jury instruction for an abuse of discretion, reversing
"only if the instructions, taken as a whole, misled the jury."
*United States v. Erramilli*, 788 F.3d 723, 730 (7th Cir. 2015).

Again, Thomas did not raise his challenge below. Quite
the contrary. His counsel told the district judge that he had
"no objection" to the jury instructions, raising the question
whether Thomas altogether waived appellate review. See
*United States v. Johnson*, 874 F.3d 990, 1000 (7th Cir. 2017)

(explaining that traditionally "approval of a jury instruction in the district court extinguishe[d] any right to appellate review of the instruction"). In recent decisions, however, we have "recognize[d] the harshness of waiver" in the context of challenges to jury instructions and "hesitate[d] to determine blanket approvals 'knowing and intentional decision[s]'" where counsel merely engaged in a "rote call-and-response colloquy with the district judge." *Id.* Here we assume that Thomas only forfeited his challenge to the jury instructions and therefore review them for plain error. See *id.* at 1001.

Thomas contends that the jury instructions wrongly conflated multiple provisions within 18 U.S.C. § 924(c)(1)(A)(i). Recall that the indictment charged Thomas with violating § 924(c)(1)(A)(i), which makes it a crime for someone to (1) possess a firearm in furtherance of a drug trafficking crime, or to (2) use or (3) carry it during and in relation to the crime. See *Haynes*, 582 F.3d at 704. The government urged the jury to find Thomas guilty only if he violated the statute the first way—if his "possession of the firearm was in furtherance of the possession with the intent to distribute methamphetamine." To obtain a § 924(c)(1)(A)(i) conviction based on possession, the government had to "present a viable theory as to how the gun furthered the drug possession or distribution (e.g., being available to protect the drugs or drug dealer)" and "present specific, non-theoretical evidence to tie that gun and the drug crime together under that theory." *United States v. Castillo*, 406 F.3d 806, 815 (7th Cir. 2005).

Thomas underscores that the jury received no instruction on what it meant to the possess a gun "in furtherance of" a drug offense—a statutory requirement mandating the showing of a "critical nexus between the particular gun at issue and

the drug trafficking offense; a nexus that . . . serves to elimi-
nate the possibility of a conviction for innocent possession of
a gun, such as when a gun is merely present at a crime scene."
*Id.* at 820 (emphasis omitted). In the same vein, Thomas says
the instructions unnecessarily defined the word "carry." He
insists that this definition was especially prejudicial because
it said that a person can "carry" a gun even if it is in a con-
tainer "such as a glove compartment"—exactly the place
Thomas's guns were found. Finally, Thomas quibbles with
the fact that the jury was given definitions for "during" and
"in relation to." Like "carry," those terms are relevant to other
ways of violating § 924(c)(1)(A)(i), but not to the exact charge
alleged in Count 2—possessing a firearm in furtherance of a
drug crime. Taken together, Thomas says, these flaws in the
jury instructions amounted to plain error.

Imperfect as they were, the jury instructions were not so
confusing or misleading as to warrant reversal under plain er-
ror review. To be sure, we agree that the more prudent ap-
proach is to include some elaboration on the meaning of the
phrase "in furtherance of." Better yet, the district court could
have drawn on our court's pattern jury instructions, which ex-
pressly "recommend[] that courts instruct jurors on the mean-
ing of 'in furtherance of' a crime of violence or drug traffick-
ing crime." PATTERN CRIMINAL JURY INSTRUCTIONS OF THE
SEVENTH CIRCUIT at 242 (2012 ed.).

Still, we cannot say that leaving out the definition compro-
mised Thomas's substantial rights. We observed in *Castillo*
that the phrase "in furtherance of" has a plain meaning that
"naturally and necessarily connotes more than mere presence
or innocent possession; as its natural meaning suggests . . . it
requires that the gun be possessed to further, advance or help

forward the drug crime." 406 F.3d at 821 (emphasis omitted). Put differently, it was not reversible error to fail to define the phrase "in furtherance of" because its apparent meaning "render[s] any definitional instruction perhaps helpful but not necessary." *United States v. Morris*, 576 F.3d 661, 673 (7th Cir. 2009). Omitting that definition here was not plain error.

Nor was the district court's choice to define the terms "during" and "in relation to." In *United States v. Harvey*, 484 F.3d 453 (7th Cir. 2007), we concluded that although an indictment was defective because it replaced "in furtherance of" with "in relation to," the error did not warrant reversal because those phrases "are close enough in meaning that [the defendant] knew the essence of the charges he was facing" when he opted to plead guilty. *Id.* at 457. Our reasoning follows a similar path here: the jury was instructed to find Thomas guilty if he possessed a firearm "in furtherance of" the drug crime, a phrase with a readily understandable connotation. We cannot conclude that the superfluous inclusion of definitions for "during" and "in relation to"—terms with a similar significance to "in furtherance of"—distracted the jury from its task to determine whether Thomas used the guns to advance his drug dealing.

Even where a jury instruction altogether omits an element of a crime, we decline to reverse under plain error review if the jury heard overwhelming evidence proving that element. See *United States v. Maez*, 960 F.3d 949, 964 (7th Cir. 2020). Not only was the error here less grave, but the state's case was strong. The jury heard unmistakable evidence showing a connection between the guns recovered from Thomas's car and the methamphetamine he planned to deliver to the government informant—the two guns and drugs literally fell out of

the glove box together. The factors we use to distinguish between mere possession of a gun and possession in furtherance of a drug crime include the time and circumstances under which the gun is found, the proximity of the gun to the drugs or drug profits, the accessibility of the gun to the defendant, and whether the gun was loaded, among others. See *United States v. Seymour*, 519 F.3d 700, 715 (7th Cir. 2008). With its burden framed this way, the government had sufficient, if not surefire, proof that Thomas was using guns to enable his drug dealing: he arrived with the methamphetamine at exactly the time and place the informant said he would, the drugs and guns were located together, all the contraband was within Thomas's reach, and the guns were loaded. The jury had ample evidence to conclude that Thomas possessed the firearms to further a drug crime.

## IV

Finally, Thomas urges us to consider the dual-role testimony and the jury instructions in combination. In assessing whether a conviction should be upheld despite two or more mistakes made at trial, we assess cumulative error, or "the harm done by the errors considered in the aggregate." *United States v. Santos*, 201 F.3d 953, 965 (7th Cir. 2000). To show cumulative error, Thomas had to establish that "considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [him] a fundamentally fair trial." *United States v. Groce*, 891 F.3d 260, 271 (7th Cir. 2018).

Whether we consider them individually or together, the errors at Thomas's trial do not undermine his firearm conviction. The jury had more than enough evidence to find beyond

a reasonable doubt that Thomas possessed the two guns in furtherance of his sale of methamphetamine.

Accordingly, we AFFIRM.