In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2702

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GLENN D. WOODEN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:19-cr-30004-CRL-KLM-1 — **Colleen R. Lawless**, *Judge.*

ARGUED OCTOBER 28, 2025 — DECIDED APRIL 30, 2026

Before BRENNAN, *Chief Judge*, and JACKSON-AKIWUMI and LEE, *Circuit Judges*.

BRENNAN, *Chief Judge*. Across three transactions, Glenn Wooden sold nearly 100 grams of methamphetamine to confidential informants. When police searched his apartment, they found another 222 grams prepared for distribution. After his arrest, Wooden admitted on video to selling methamphetamine.

After a jury trial, Wooden was convicted of possessing and distributing methamphetamine. In the district court and on appeal, he contends his convictions should be reversed, and his sentence vacated, because the government failed to prove he sold "illegal" methamphetamine. In his view, the Controlled Substances Act covers only the "optical isomers" of methamphetamine, not the generic drug. *See* 21 U.S.C. §§ 812, 841(b)(1). So, it was not enough for the government to put on expert testimony from a Drug Enforcement Administration chemist, confirming the "methamphetamine" Wooden sold was 98% pure d-methamphetamine hydrochloride—in layman's terms, crystal meth. Rather, prosecutors had to prove the drugs contained specific kinds of molecules.

Wooden submits the district court erred during trial by not properly instructing the jury and not taking precautions as to witness testimony. He also contends insufficient evidence supported the drug quantity for which he was convicted. Underlying these challenges is Wooden's primary assertion that "[n]ot all methamphetamine is illegal as a matter of federal law." Because this is not correct, we affirm the district court.

**I**

In 2018, the West Central Illinois Task Force learned about Wooden's drug dealing from an informant, so it organized a series of controlled buys to catch him in the act. Each transaction involved more meth, and Wooden made over $2,600 in profits. Based on audio and video recordings of the buys, officers secured a warrant to search Wooden's apartment. There, they recovered many of the marked bills from the drug sales and a Crown Royal whisky box full of plastic baggies, each containing a different amount of methamphetamine.

Law enforcement arrested Wooden after the third controlled buy. In a videotaped interview, he admitted that he and an associate had picked up two "bricks" (kilograms) of ice methamphetamine from Iowa the day before, broken them down into smaller amounts, and packaged them for distribution. He also admitted to distributing two "zips" (ounces) of meth during the controlled buy earlier that morning. Wooden made clear he knew the drugs were "hot"—slang for "illegal." Based on this evidence, Wooden was indicted on three counts of distributing, and one count of possessing, "methamphetamine (actual)."

Wooden chose to represent himself at trial. The government called six witnesses who testified about the controlled buys and offered evidence that the drugs Wooden sold were methamphetamine. One witness, DEA Chemist Louis Chavez, confirmed the weights of "pure methamphetamine" Wooden sold based on several rounds of standard lab testing.

Wooden did not challenge the government's characterization of the controlled buys or his confession. Rather, his main defense was that the government had not proved the exact molecular composition of the "methamphetamine" he distributed. Wooden repeatedly made this argument:

- In his opening statement, he declared, "[t]he methamphetamine that the Government alleged I sold and possessed, they must prove it's criminalized."

- He proffered his own jury instructions, which would require the government to prove he distributed "a controlled substance

 being methamphetamine, its salts, isomers, or salts of isomers."

- He asked every witness if they knew "what chemical formula makes methamphetamine illegal."

- And his post-trial motion for a judgment of acquittal laid out "case law" supporting his theory.

To combat Wooden's frequent suggestions that "some methamphetamine is legal," the government asked the district court to take judicial notice of the fact that "the distribution of controlled substances, including methamphetamine, [is] illegal under federal law." The government noted that methamphetamine "is listed in the statute by name"—unlike some other controlled substances, which are defined by chemical formula. Wooden vehemently opposed the government's request, insisting "that methamphetamine has a chemical formula that is illegal inside of it, inside of methamphetamine."

Wooden did not always clearly explain his theory at trial. But in his motion for a judgment of acquittal, he identified the basis for his argument. Relying on language in this court's categorical approach cases, Wooden believed the Controlled Substances Act criminalizes only some methamphetamine isomers, not the stimulant more generally. *See United States v. De La Torre*, 940 F.3d 938, 951 (7th Cir. 2019); *Aguirre-Zuniga v. Garland*, 37 F.4th 446, 451–53 (7th Cir. 2022). As Wooden insisted, "isomers and salts are the chemical formulas of methamphetamine."

The district court disagreed with Wooden. It provided a statement to the jury clarifying that all methamphetamine is

illegal. And the court instructed the jury using the Seventh Circuit's pattern instruction, which employs "methamphetamine" as a generic term. THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT 846–47 (2023 ed.).

The jury found Wooden guilty on all counts. Due to the large quantities of methamphetamine he trafficked, he faced higher mandatory minimums. *See* 21 U.S.C. § 841(b)(1). Ultimately, the district court sentenced him to twenty-five years in prison—a below-Guidelines sentence reflecting his prior history of state drug crimes and his responsibility for over 300 grams of "ICE methamphetamine," or "d-methamphetamine hydrochloride" of at least 80% purity. U.S. SENT'G GUIDELINES MANUAL § 2D1.1.

## II

Nearly every argument in this appeal hinges on one issue: the meaning of the word "methamphetamine" in the Controlled Substances Act. Pub. L. 91-513 (1970). The government, relying on this circuit's pattern jury instructions, uses it as a broad term covering a range of different drugs. By contrast, Wooden thinks the statute defines "methamphetamine" at a molecular level, requiring the government to prove the substance he sold was made of prohibited isomers.

He raises two challenges that depend on the answer to this question: whether the district court erred by offering the pattern jury instruction for methamphetamine convictions, and whether the government supplied sufficient evidence of the accurate drug weight to trigger mandatory minimums. We review de novo whether jury instructions accurately state the law. *United States v. Bonin*, 932 F.3d 523, 537–38 (7th Cir. 2019).

The same is true of a sufficiency of the evidence challenge properly raised in a motion for a judgment of acquittal. *United States v. Godinez*, 7 F.4th 628, 638 (7th Cir. 2021).[1]

### A. Background

To see why Wooden's arguments fail as a matter of law, it is important to understand the structure of the Controlled Substances Act and some basic chemistry.

#### 1. *The Act*

In 1970, Congress enacted the Controlled Substances Act as part of a broad effort to consolidate and modernize federal drug controls. Responding to rampant drug abuse throughout the 1950s and 1960s, Congress repealed almost all prior

---

[1] The government believes Wooden waived, or at least forfeited, both his jury instruction and his sufficiency of the evidence challenges. He preserved the latter in his motion for a judgment of acquittal. But he explicitly told the district court he had no objection to the main jury instruction he challenges on appeal. This court, however, has "hesitate[d]" to find waiver "where counsel merely engaged in a rote call-and-response colloquy with the district judge" during a jury instructions conference. *United States v. Thomas*, 970 F.3d 809, 816 (7th Cir. 2020) (citation modified). More to the point, Wooden repeatedly raised his "isomer" theory at every critical point of the trial, and he objected to another one of the government's jury instructions touching on the same issue.

The touchstone of waiver is the "intentional relinquishment or abandonment of a known right." *Bradley v. Village of University Park*, 59 F.4th 887, 895 (7th Cir. 2023). And forfeiture only occurs when a party does not "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." *United States v. Johnson*, 47 F.4th 535, 542 n.2 (7th Cir. 2022). Given that Wooden represented himself and reiterated the same theory throughout his trial, we cannot say he intentionally relinquished this argument, nor did he fail to inform the court of his concerns. Accordingly, de novo review is appropriate.

drug legislation and replaced it with the Comprehensive Drug Abuse Prevention and Control Act of 1970. *See* Pub. L. No. 91-513, 84 Stat. 1236 (1970). Title II of that Act, known as the Controlled Substances Act, became the centerpiece of the reform. *See* 21 U.S.C. §§ 801–904.

Congress structured the Act to strike a balance between two goals. It recognized that many controlled substances "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people." 21 U.S.C. § 801(1). Yet it emphasized that the "improper use of controlled substances," as well as their "illegal importation, manufacture, distribution, and possession," have "a substantial and detrimental effect on the health and general welfare of the American people." *Id.* § 801(2).

Accordingly, the Act designates a broad range of substances as "controlled," but it varies the level of regulation based on the likelihood of abuse and genuine medical benefits of each substance. *Id.* § 812(b). Congress also created pathways to obtain exemptions, allowing controlled substances to go on the market in limited circumstances. *See, e.g., id.* § 811(g). Of course, it is always illegal to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" outside of the legitimate channels approved by the Act. *Id.* § 841(a)(1).

Before 1970, no federal legislation identified methamphetamine by name. That changed with the Controlled Substances Act. Now, "[a]ny substance … which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers," falls under the Act's regulations. 21 U.S.C. § 812

Schedule III(a)(3); *see also id.* Schedule II(c).[2] In 1988, Congress added a second provision mentioning methamphetamine: mandatory minimums for offenses involving certain amounts of "methamphetamine, its salts, isomers, and salts of isomers" or mixtures containing "a detectable amount" of the same. 21 U.S.C. § 841(b)(1); *see* Anti-Drug Abuse Amendments Act of 1988, Pub. L. No. 100-690, § 6470(g), 102 Stat. 4378.

The Act does not define "methamphetamine." But it does define another key term: "'isomer' means the optical isomer." 21 U.S.C. § 802(14). Congress, then, made two related choices when it regulated methamphetamine. It limited the kinds of isomers covered by the statute to "optical isomers," but it did not elaborate on the meaning of "methamphetamine." Both choices are at issue in this case.

### 2. *The Science*

Wooden's statutory argument also requires some basic chemistry knowledge. His reasoning implicates the phrase "optical isomer[s]," which are not further defined by statute. 21 U.S.C. § 802(14). And it touches on ambiguities in the way scientists use the word "methamphetamine."

Isomers are molecules with the same chemical formula but different arrangements of atoms in space—differences that often change the substance's properties. MARTIN S. SILBERBERG, PRINCIPLES OF GENERAL CHEMISTRY 84 (3d ed. 2012). Roughly speaking, there are three kinds of isomers: optical, geometric,

---

[2] By regulation, all substances containing methamphetamine have been reclassified as Schedule II controlled substances. *See* 21 C.F.R. § 1308.12(d) (2026). This has been the case since 1973. *See* Schedule of Controlled Substances, 38 Fed. Reg. 8254, 8256 (Mar. 30, 1973) (to be codified at 21 C.F.R. § 308.12).

and positional. *Id.* at 467–70.[3] Optical isomers come in pairs: the two molecules not only have the same chemical formula, but all the atoms are in the exact same order. *Id.* at 468–69. The only difference between them is that they are mirror images of one another, like a right and left hand. *Id.*

This matters because "methamphetamine" has optical isomers. Sometimes, scientists use the word "methamphetamine" to describe specific molecules sharing the chemical formula $C_{10}H_{15}N$. That molecule can exist as two optical isomers: dextromethamphetamine (or d-methamphetamine) and levomethamphetamine (or l-methamphetamine). These molecules have vastly different effects on the human body, so they are valued differently in the drug market.[4] As this court once noted, "[p]roducers, suppliers, and users of methamphetamine want to obtain d-methamphetamine, not l-methamphetamine, because the latter form has little or no physiological effect and is worthless." *United States v. McEntire*, 153 F.3d 424, 431 (7th Cir. 1998). Accordingly, d-methamphetamine products have been tightly regulated for years, but the less-potent l-methamphetamine has been an active ingredient in over-the-counter inhalers for nearly a century.[5]

_____

[3] Wooden treats these three kinds of isomers as if they are chemically equivalent. But positional isomers ("constitutional" or "structural" isomers) "have different arrangements of atoms," while "stereoisomers" (optical and geometric isomers) "have the same atom arrangement but different spatial orientations." SILBERBERG, *supra*, at 459.

[4] *See* John Mendelson et al., *Human Pharmacology of the Methamphetamine Stereoisomers*, 80 CLIN. PHARMACOL. THER. 403, 404–05 (2006).

[5] Donald R. Wesson, David E. Smith & John P. Morgan, *The International Scheduling of OTC Inhaler Ingredients: An Abuse Perspective*, 18 J. PSYCHOACTIVE DRUGS 151, 151–52 (1986).

The $C_{10}H_{15}N$ molecule also has positional isomers. One commonly cited example is a food additive known as *N,N*-Dimethylphenethylamine, which has a "sweet fishy aroma" and is used to flavor processed foods. Scientists do not commonly refer to these positional isomers as "methamphetamine," instead reserving that term for the optical isomers.[6]

Beyond these molecular definitions, scientists use the word "methamphetamine" in another way. Properly speaking, it refers to "an equal mixture of dextromethamphetamine and levomethamphetamine" known as dl-methamphetamine.[7] This mixture flooded American streets in the late 1960s because it was the main product created by illicit amateur labs. Pharmaceutical companies and industrial scale operations have the capacity to refine dl-methamphetamine into pure d-methamphetamine; home brewers usually do not have the means or the motive to do so.[8]

---

[6] Rodney A. Higgs & Richard A. Glennon, *Stimulus Properties of Ring-Methyl Amphetamine Analogs*, 37 PHARMACOL. BIOCHEM. & BEHAVIOR 835, 835 (1990) ("the term[] methamphetamine" is "commonly employed to refer only to the N-methyl analog of amphetamine," not positional isomers); *see* GEORGE A. BURDOCK, FENAROLI'S HANDBOOK OF FLAVOR INGREDIENTS 499 (6th ed. 2010).

[7] Rama Yasaei & Abdolreza Saadabadi, *Methamphetamine*, Nat'l Libr. Med. (May 1, 2023), https://www.ncbi.nlm.nih.gov/books/NBK535356/.

[8] *See* M. Douglas Anglin et al., *History of the Methamphetamine Problem*, 32 J. PSYCHOACTIVE DRUGS 137, 138 (2000); *Crime in America—Why 8 Billion Amphetamines?: Hearings on H. Res. 17 Before the H.R. Select Comm. On Crime*, 91st Cong. 754–56 (1969) [hereinafter *Hearings*] (Abbott Laboratories representative doubted that most street "methamphetamine" was "d-methamphetamine" because "that form of the drug is considerably more difficult to manufacture because … the levo (l) isomer must be removed.").

### B. Definition of Methamphetamine

What sense of the word "methamphetamine" did Congress enact in 21 U.S.C. §§ 812 and 841? Because these statutes have not been amended since enactment, this question must be answered by looking to "the text's 'ordinary, contemporary, common meaning.'" *Hulce v. Zipongo, Inc.*, 132 F.4th 493, 497–98 (7th Cir. 2025) (quoting *Delaware v. Pennsylvania*, 598 U.S. 115, 128 (2023)). In other words, "we should consider the meaning 'at the time Congress enacted the statute,'" not our understanding of the words today. *Id.* at 498 n.3 (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018)). To ascertain the ordinary meaning of words not defined in older statutes, courts can look to dictionaries and encyclopedias from the time of enactment, the statutory context, relevant caselaw, the regulatory backdrop, and other sources that might shed light on the semantic meaning of the relevant terms. *Wis. Cent.*, 585 U.S. at 277–80.

We proceed in two steps. First, we examine the text of the relevant statutes. Second, we consider evidence of the ordinary meaning of the word "methamphetamine" at the time Congress passed these statutes. This analysis leads us to hold that the word "methamphetamine," as used in the Controlled Substances Act, refers to the forms of the substance $C_{10}H_{15}N$ commonly used for their stimulating effects. "Methamphetamine," WEBSTER'S THIRD NEW INT'L DICTIONARY 1422 (1971).

#### 1. *Statutory Text*

The full text of 21 U.S.C. § 812 makes "[a]ny substance … which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers" a controlled substance. 21 U.S.C. § 812 Schedule III (a)(3). On its face, this provision

does not define the word "methamphetamine." It instead reveals the sweeping manner in which Congress sought to control the distribution of methamphetamine.

The Act does not label "methamphetamine," standing alone, a controlled substance. Rather, it covers "*any substance … which contains any quantity* of methamphetamine." *Id.* § 812 Schedule III (a)(3) (emphasis added). For a jury to find someone guilty of distributing methamphetamine, then, the prosecution only needs to show the substance contains *any quantity* of methamphetamine, however that word is defined.

Wooden reads the statute differently. In his view, the phrase "its salts, isomers, and salts of isomers" defines the word "methamphetamine." So, for the prosecution to secure a conviction under this statute, Wooden thinks it must prove the existence of a "salt," "isomer," or "salt of isomers" in the substance. And because 21 U.S.C. § 802(14) defines "isomer" as "the optical isomer," he concludes that the word "methamphetamine" means "optical isomers (of methamphetamine)."

There are several errors with Wooden's reading. For one, it ignores the fact that the statute does not purport to define the word "methamphetamine"—a reason for pause, given Congress's willingness to define specific terms elsewhere in the Act. *See id.* § 802. For another, Wooden's interpretation creates downstream problems. It effectively reads two key words out of the statute: "including" and "methamphetamine" itself. His interpretation "runs squarely into one of the most basic canons of [statutory] interpretation: that 'every clause and word of a statute should, if possible, be given effect.'" *United States v. Hyatt*, 28 F.4th 776, 783 (7th Cir. 2022) (collecting cases and citing ANTONIN SCALIA & BRYAN A.

Garner, Reading Law: The Interpretation of Legal Texts 174 (2012)).

Consider Wooden's reading of the word "including." Again, the provision governs "any substance … which contains any quantity of methamphetamine, *including* its salts, isomers, and salts of isomers." 21 U.S.C. § 812 Schedule III (a)(3) (emphasis added). Wooden makes a crucial assumption: to him the word "including" limits the scope of substances covered by the statute. That move stretches the text too far.

An example illustrates this point. Imagine a person tells his friend, "I will pay for dinner, including appetizers and desserts." The word "dinner" is an expansive word which could encompass a variety of foods—appetizers, drinks, soups, salads, desserts, and main courses. But an ordinary person would likely assume that an entrée is part of a "dinner." So it would be strange if that person stuck the friend with the bill for the entrées, pleading, "By 'dinner,' I never meant the whole meal—I just meant appetizers and desserts. That's why I specified those two." This interpretation would contravene the meaning of both "dinner" (which usually includes a main course) and "including" (which, in this context, identifies some specific examples as part of the general term). So too here: "including" illustrates the reach of the statute, showing that many substances containing forms of methamphetamine fall within its ambit. The word "including" does not limit or redefine the word "methamphetamine." *See also* Scalia & Garner, *supra*, at 132–33 ("the word *include* does not ordinarily introduce an exhaustive list").

Further, Wooden's reading creates an incongruity between the schedule of controlled substances and the

mandatory minimum provisions. Unlike § 812, § 841 does not include the words "any substance" or "including" when it discusses methamphetamine. It instead sets punishments based on certain weights of "methamphetamine" and "its isomers" separately. *Id.* The statute offers two tracks for increasing the mandatory minimum sentence applied to a methamphetamine crime. First, it covers those who traffic certain amounts of pure "methamphetamine, its salts, isomers, and salts of isomers." 21 U.S.C. § 841(b)(1)(A)(viii), (b)(1)(B)(viii). Second, it covers those who commit crimes involving "a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers." *Id.*

Wooden invites us to import the "definition" of methamphetamine—"optical isomers"—from the schedule of controlled substances in § 812 to the mandatory minimum provisions in § 841. Taken literally, this argument reads the word "methamphetamine" out of § 841. If we replaced "methamphetamine" with "isomers," § 841 would effectively punish the illegal distribution of "methamphetamine isomers" twice. Embracing this redundancy would invalidate Congress's choice to identify isomers apart from the generic term "methamphetamine," both here and in § 812.

### 2. *Ordinary Meaning Analysis*

We turn now to the ordinary meaning of the word "methamphetamine," as it was understood when Congress enacted the Controlled Substances Act. This review of the regulatory history and popular understanding of the word leads us to reject Wooden's cramped construction of this statute. In 1970, scientists, journalists, and regulators all recognized the distinctions between different methamphetamine compounds. Yet the Act uses a generic term, rather than listing specific

isomers. So, we conclude that the label "methamphetamine" covers a range of substances known by various scientific terms, street names, and pharmaceutical trademarks.

Scientists have long known about the differences between the isomers of the $C_{10}H_{15}N$ molecule, recognizing how the physiological effects of a substance vary based on the isomer at issue.[9] No new scientific developments after the enactment of the statute have confused the meaning of the text. Congress chose "methamphetamine," not d- or l-methamphetamine, even though the more specific, technical terms were available.

The regulatory backdrop reflects this understanding. In 1965, Congress intervened to address the global crisis of amphetamine abuse, which arose in the wake of World War II.[10] So it passed the Drug Abuse Control Amendments of 1965—a direct predecessor of the Controlled Substances Act. This statute mentioned only "amphetamine," not "methamphetamine." Pub. L. No. 89-74, § 3(a), 79 Stat. 226, 227 (1965). But the law gave the FDA authority to designate any drug that is

---

[9] *See, e.g.*, Gordon A. Alles, *The Comparative Physiological Actions of dl-β-Phenylisopropylamines*, 47 J. PHARMACOL. EXP. THER. 339, 339–40, 351–52 (1933); Mendelson et al., *supra* note 4, at 405 & n.8–10 (collecting articles from 1939 and 1940); F.L. Golla, J.M. Blackburn, & S. Graham, *A Comparison Between Some of the Effects of Isomyn (Benzedrine) and of Methylisomyn*, 48 J. MENT. SCI. 48, 49–50 (1940) (noting that d-methamphetamine, or d-methylisomyn, may be more dangerous than benzedrine); ALFRED BURGER, MEDICINAL CHEMISTRY: CHEMISTRY, BIOCHEMISTRY, THERAPEUTIC AND PHARMACOLOGICAL ACTION OF NATURAL AND SYNTHETIC DRUGS 312 (1st ed. 1951) (seminal pharmacology textbook notes the difference between Pervitin, a German brand-name for methamphetamine, and "the dextro isomer of Pervitin, called Methedrine.").

[10] *See* Anglin et al., *supra* note 8, at 138.

"habit forming because of its stimulant effect on the central nervous system" as a controlled substance. *Id.*

Following an extensive public comment period, the FDA chose to subject methamphetamine to additional controls. Listing of Additional Drugs Subject to Control, 31 Fed. Reg. 4679, 4679–80 (Mar. 19, 1966) (to be codified at 21 C.F.R. 166); *see also* Regulations Implementing Drug Abuse Control Amendments of 1965, 31 Fed. Reg. 1071, 1071–74 (Jan. 27, 1966). Meth had exploded in popularity a few years earlier, thanks to the ease with which amateurs could set up their own labs and cheaply produce crude dl-methamphetamine. Roger C. Smith, *Traffic in Amphetamines: Patterns of Illegal Manufacture and Distribution*, 2 J. PSYCHADELIC DRUGS 20, 20–22 (1969). So the FDA promulgated a regulation targeting the most dangerous substances: "all drugs … containing any amount of … *d-*, *dl-* Methamphetamine and their salts." 21 C.F.R. § 166.3 (1967 ed.); *see also* 21 C.F.R. § 320.3 (1969 ed.).

This regulation shows that rule makers knew how to single out different forms of "methamphetamine." They distinguished between an optical isomer (d-methamphetamine) and a mixture (dl-methamphetamine), all while excluding the less potent l-methamphetamine isomer. They targeted the most deadly and prevalent forms of the drug available on the market at this time. Unlike Congress, the FDA chose not to control all kinds of "methamphetamine."

By the late 1960s, the public also became aware of the deadly effects of methamphetamine abuse. Methamphetamine, often known as "speed," was seen as an unusually dangerous variant of the general class of amphetamines. And Congress grew concerned with the "horror stories about the 'speed-freak'"—young        people        so        addicted        to

methamphetamine that they entered states of panic, paranoia, malnutrition, and unpredictable behavior. *Hearings*, *supra* note 8, at 601.

Because this crisis arose in the mid-1960s, dictionaries in 1970 had not yet defined the word "methamphetamine," as distinct from the general term "amphetamines." But a 1969 *New York Times* "Medicine" column explained the different substances in the amphetamine "drug family." It identified both the generic names of the substances and common brand names. William K. Stevens, *Trouble for the 'Speedsters*,' N.Y. Times, Feb. 2, 1969, at E11. These included "amphetamine itself (Benzedrine), dextro amphetamine (Dexedrine), methamphetamine (Methedrine and De[s]oxyn), and phenmetrazine (Preludin)." *Id.* Yet the column singled out the "most common amphetamine used by the 'drug-using subculture'" as "methamphetamine – Methedrine and De[s]oxyn to the pharmacist, 'speed' to the East Village mainliner." *Id.* The public, then, would recognize the generic term "methamphetamine" as a catch-all term for different brand names (Methedrine and Desoxyn) and slang terms (speed), without worrying about the differences between different isomers.

Against this backdrop, Congress chose to regulate methamphetamine by name, not chemical formula, in the Controlled Substances Act. Congress could have specified different isomers if it wanted. And the rest of the Act shows it singled out substances by their chemical formulas when appropriate. *Compare* 21 U.S.C. § 812 Schedule I (c)(18)–(28) (chemical formulas), *with id.* at Schedule II (a) *and* Schedule III (e) (using umbrella terms like "Opium" and "Anabolic steroids"). Here, Congress chose the generic term.

Ultimately, Congress used a word broad enough to ensure substances containing d-, l-, and dl-methamphetamine fell within the statute's ambit. In line with the interpreters of the 1960s, we read the word "methamphetamine" as covering more than just d- or l-methamphetamine isomers in isolation.

## C. Subsequent Caselaw

Wooden's reading of the Act departs from a near-universal understanding of its broad scope. He thinks our categorical approach cases require this change, but he is not correct. To show why, we first review the post-enactment implementation of these statutes. Then, we explain how our holding does not contradict this court's precedent.

### 1. *Post-Enactment Developments*

Courts do not require prosecutors to prove "methamphetamine" contains optical isomers—and they have not since the 1970s. In most early appellate cases reviewing convictions under 21 U.S.C. § 841, courts assumed that "methamphetamine" was a generic term covering different products. *See, e.g., United States v. Cannon*, 472 F.2d 144, 144 (9th Cir. 1972); *United States v. Olson*, 504 F.2d 1222, 1223 (9th Cir. 1974); *United States v. Santillo*, 507 F.2d 629, 630–32 (3d Cir. 1975); *United States v. Thor*, 512 F.2d 811, 812–13 (5th Cir. 1975); *Dunn v. United States*, 442 U.S. 100, 103 (1979). Of course, judges knew about different kinds of meth, including d-methamphetamine hydrochloride. *United States v. Masullo*, 489 F.2d 217, 219 (2d Cir. 1973) ("methamphetamine hydrochloride—popularly known as 'speed'"); *United States v. Eastwood*, 489 F.2d 818, 819 (5th Cir. 1973) ("approximately 100,000 tablets of d-methamphetamine hydrochloride"). They identified dl-methamphetamine by name. *United States v. Schmaltz*, 562

F.2d 558, 559 (8th Cir. 1977). And they noted the importance of chemical testing to distinguish "pure methamphetamine" from mixed substances. *See, e.g., United States v. Welebir*, 498 F.2d 346, 348–50 (4th Cir. 1974); *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975); *United States v. Johnson*, 513 F.2d 819, 822 n.1 (2d Cir. 1975) (discussing procedures used for testing). Still, methamphetamine was treated generically, even if there was clear evidence of an isomer or salt form. *See, e.g., United States v. Larson*, 507 F.2d 385, 390 (9th Cir. 1974) (noting the statute implicates "[m]ethamphetamine, in all its forms," including "desoxyn, a tablet form of methamphetamine"); *cf. United States v. Russell*, 411 U.S. 423, 424–27 (1973) (generic methamphetamine offense under predecessor statute, but the facts indicate dl-methamphetamine).

The regulatory history also shows this statute covered more than just d-methamphetamine isomers. Six years after Congress passed the Act, for example, the DEA created exemptions for specific products containing methamphetamine through 21 U.S.C. § 811(g). Though the "Vicks Inhaler" only included "L-Desoxyephedrine" (l-methamphetamine), and Rynal Spray contained dl-methamphetamine hydrochloride, both products needed exemptions from the Act. *See* Excluded Non-Narcotic Substances, 41 Fed. Reg. 16552, 16552–53 (Apr. 20, 1976) (to be codified at 21 C.F.R. § 1308.22). There would be no need for pharmaceutical companies to pursue exemptions if the statute's text did not cover these substances.

Moreover, dictionaries published in the 1970s confirmed the ordinary meaning of methamphetamine. Early definitions of the word do not distinguish between the different methamphetamine isomers *per se*. Instead, they define it as "an amine $C_{10}H_{15}N$ used in the form of its crystalline hydrochloride as a

stimulant for the central nervous system and in the treatment of obesity." "Methamphetamine," WEBSTER'S NEW COLLEGIATE DICTIONARY 723 (1973 & 1975); *Cf.* "Methamphetamine," WEBSTER'S THIRD NEW INT'L DICTIONARY 1422 (1971) ("an amine $C_6H_5CH_2CH(CH_3)NHCH_3$ used in the form of its crystalline hydrochloride as a stimulant for the central nervous system and in the treatment of obesity"), *and* WEBSTER'S NEW WORLD DICTIONARY 894 (1979) ("a white crystalline derivative of amphetamine, $C_{10}H_{15}N$, used in the form of its hydrochloride as a drug with a stronger stimulating action than amphetamine"). If there was any lingering doubt, the ordinary meaning of "methamphetamine" covered crystal methamphetamine when Congress added mandatory minimums in 1988. *See* 21 U.S.C. § 841; "Methamphetamine," WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 854 (1988); *see also id.* (defining "Methedrine" as the "*trademark for* methamphetamine hydrochloride" when that "compound [is] used as a drug"); *id.* at 853 (defining "meth" as slang for "Methedrine"); *id.* at 1288 ("speed" can be slang for "Methedrine").

Courts did not express doubts about using "methamphetamine" as a generic term until the 1990s—and that was because of the United States Sentencing Guidelines, not the text of the statute. In the first version of the Guidelines, the penalties for crimes involving "Methamphetamine" and "L-Methamphetamine" differed in the drug equivalency tables. U.S.S.G. § 2D1.1 (1987 ed.) By 1995, though, the Guidelines dropped the reference to l-methamphetamine, replacing it with a threefold distinction between "methamphetamine," "methamphetamine (actual)," and "ice," which persists to this day. *Compare id.* (1994 ed.), *with id.* (1995 ed.) *and* (2025 ed.). The Guidelines define "ice" as "a mixture or substance containing d-methamphetamine hydrochloride of at least

80% purity." U.S.S.G. § 2D1.1. As in this case, many prosecutors charge meth cases according to the Guidelines, not the statute.

Both the Third and Eleventh Circuits have recognized that the former Guidelines required more specificity than the statute. Each court vacated a sentence because the government failed to distinguish whether the "methamphetamine" involved was d-methamphetamine or l-methamphetamine. *United States v. Bogusz*, 43 F.3d 82, 86–92 (3d Cir. 1994); *United States v. Patrick*, 983 F.2d 206, 208–11 (11th Cir. 1993). But in both cases, the court did not question the underlying conviction, which only required the government to prove the existence of generic "methamphetamine." *See also United States v. Carroll*, 6 F.3d 735, 742–43 (11th Cir. 1993) (same).

The Third Circuit also declined to import this distinction into the text of the statute. In *United States v. DeJulius*, 121 F.3d 891 (3d Cir. 1997), a defendant pleaded guilty to being a member of a conspiracy to distribute nineteen pounds of methamphetamine. *Id.* at 892. When the government tried to apply the ten-year mandatory minimum statute, though, the defendant objected. *Id.*; 21 U.S.C. § 841. He argued the statute required the government to prove "the methamphetamine in question was actually D-methamphetamine as opposed to L-methamphetamine." *DeJulius*, 121 F.3d at 892. As here, the government did not prove the precise isomeric content of the methamphetamine in question. The district court instead found the defendant accountable for "111.6 grams" of "DL-methamphetamine hydrochloride" based on an expert chemist's testimony. *Id.* It then assumed half of the substance was d-methamphetamine and half was l-methamphetamine,

declining to apply the ten-year mandatory minimum as a result. *Id.* at 893.

In the Third Circuit's view, the case presented the question of "whether 'methamphetamine' under 21 U.S.C. [§ 841] means D-methamphetamine." *DeJulius*, 121 F.3d at 893. Looking to the "plain language of the statute," the court concluded it "makes no distinction between the different isomeric types of methamphetamine" by "its explicit terms." *Id.* at 893–94. Rather, both isomeric forms—as well as the mixture dl-methamphetamine and salts like dl-methamphetamine hydrochloride—all qualified as "methamphetamine." *See id.* at 894 ("[I]t makes no difference for purposes of the mandatory minimum statute whether the substance in question is D-methamphetamine, L-methamphetamine, or DL-methamphetamine."). So, the Third Circuit reversed because "the district court erred by not applying the ten-year mandatory minimum sentence." *Id.* at 895. The government had proved that "111.6 grams of dl-methamphetamine were attributable to" the defendant, satisfying the requirement of proving actual "methamphetamine" under the statute. *Id.*[11]

We agree with the Third Circuit's analysis. Prosecutors do not need to differentiate between the d- and l-methamphetamine isomers to secure a conviction or ask courts to apply mandatory minimums under 21 U.S.C. § 841.

---

[11] *DeJulius* also noted the Sentencing Commission removed its reference to l-methamphetamine after the Third Circuit decided *Bogusz*, rendering that case "virtually obsolete." 121 F.3d at 894. The distinction between the different isomers, it concluded, was only relevant "for those few defendants whose conduct occurred" before the amendment and "for whom the mandatory statutory minimum is not applicable." *Id.* at 894–95.

### 2. *Categorical Approach Cases*

Before the district court, Wooden insisted he had "case law" supporting his theory, which otherwise contradicts the text and history of the statute. But the precedent he invokes—*United States v. De La Torre*, 940 F.3d 938 (7th Cir. 2019), and *Aguirre-Zuniga v. Garland*, 37 F.4th 446 (7th Cir. 2022)—concerns a different area of law: categorical approach cases, where this court considered whether prior state-level methamphetamine crimes qualified as predicate offenses for heightened penalties. Both cases examined Indiana statutes, asking whether they were categorically broader than their federal counterpart.

*De La Torre* acknowledged that the text of 21 U.S.C. § 812 and the Indiana code were identical, making them a "seeming match." 940 F.3d at 951. But "a closer look reveal[ed] otherwise," because the federal statute "defines the term 'isomer' to mean 'the optical isomer,'" while the state statute did not define "isomer" at all. *Id.* The court concluded that all isomers, including geometric and positional isomers, fell within the state statute's ambit. Summarizing this finding, this court loosely said, "[F]or purposes of federal drug offenses, methamphetamine includes only its optical isomers." *Id.*

Assuming this conclusion, *Aguirre-Zuniga* considered another Indiana statute, ruling that it was also "overbroad" because "the Indiana definition includes something more than just optical isomers of methamphetamine." 37 F.4th at 451 (quoting *De La Torre*, 940 F.3d at 951). Again, the relevant Indiana statute did not define the term "isomer." This time, the government tried to argue the statute covered no isomers at all, meaning it was not categorically broader than its federal analog. This court rejected that argument. Relying on a brief

discussion of the science of methamphetamine isomers, we said, "If the Indiana Statute does not cover *any* isomers, it arguably would not reach methamphetamine itself," rendering that statute "impotent—a criminal statute that criminalizes nothing." *Id.* at 453. So this court declined to read "isomer" out of the state statute, finding it categorically broader than 21 U.S.C. § 841.

In Wooden's view, these cases stand for the proposition that the "federal definition of methamphetamine includes only its optical isomers." *De La Torre*, 940 F.3d at 951; *see also United States v. Turner*, 47 F.4th 509, 520 (7th Cir. 2022) ("Federal law … criminalized only optical isomers of methamphetamine."). But this reading does not match the text of the federal statute, which treats "methamphetamine" and "its isomers" as separate categories. *See supra*, II.B.1. Moreover, *De La Torre* and *Aguirre-Zuniga* do not purport to interpret the word "methamphetamine." Both cases instead focus on the meaning of the word "isomers" in the federal statute, contrasting it with Indiana law's treatment of the same term. Because those cases address a completely different legal question, they do not apply here.

## D. Application to Wooden's Challenges

Based on the foregoing, we decline to follow Wooden into an interpretation of the word "methamphetamine" that rewrites the statute and upends decades of precedent. For over fifty years, this court has upheld convictions based on a generic definition of methamphetamine. *Compare United States v. Owens*, 162 F.4th 844, 847 (7th Cir. 2025), *with United States v. Cortwright*, 528 F.2d 168, 172–74 (7th Cir. 1975) (using "speed" and "methamphetamine" interchangeably), *and United States v. Ellery*, 678 F.2d 674, 676 (7th Cir. 1982)

(discussing "an ingredient used in manufacturing a controlled substance called methamphetamine."). That view properly understands the text of the underlying statute.

By declining to depart from this consistent understanding of the statute, we also avoid unsettling standard practices for identifying and proving the existence of methamphetamine in federal court. Per the DEA's standard operating procedures,[12] chemists must engage in two different tests to determine whether a substance contains methamphetamine. These tests also reveal the purity of the methamphetamine, as well as the salt form present in the substance. But chemists conduct a third test—one that specifically identifies the isomers present in the substance—only upon request. Wooden's view of the statute would require the government to ask for this test every time it wants to secure a conviction under the statute. The Controlled Substances Act does not require such a granular level of detail.

Accordingly, the district court did not err by following this circuit's pattern jury instructions and defining "methamphetamine" generically. As noted above, the word "methamphetamine" encompasses only the forms of $C_{10}H_{15}N$ used for their stimulating effects. So, the government does not need to specifically identify the methamphetamine as an "optical isomer" before the jury to secure a conviction under 21 U.S.C. § 841. Of course, the government must abide by the standard practices for proving a substance is methamphetamine. In this

---

[12] *See* "Standard Operating Procedure for the Analysis of Suspected Methamphetamine," DEA.GOV (Aug. 30, 2024), https://www.dea.gov/documents/2024/2024-08/2024-08-30/standard-operating-procedure-analysis-suspected-methamphetamine (discussing the Marquis color test and mass spectrometry tests required to identify methamphetamine).

case, it cleared the bar by conducting thorough chemical testing, in line with the DEA's standard procedures, and presenting those results to the jury.

Wooden's position faces two additional hurdles, even on his reading of the law. First, Wooden admits the jury heard testimony that "there were *some* optical isomers" present, which is all the government would need for a conviction under his view of the statute. Second, methamphetamine hydrochloride—the substance Wooden sold and possessed—is a salt of methamphetamine, not an isomer. So, Wooden could still be convicted and sentenced based on the evidence of the salt form presented at his trial. *See* 21 U.S.C. § 812 Schedule III (a)(3) (controlling "[a]ny substance … which contains any quantity of methamphetamine, including its salts").

Because Wooden's primary theory fails, his sufficiency of the evidence challenge also cannot stand. He contends the jury needed to be told the meth was pure d-methamphetamine isomers—which is incorrect, because the mandatory minimum portions of § 841 use "methamphetamine" as a generic term. Again, the government offered ample evidence that the entire pure substance was crystal meth (that is, d-methamphetamine hydrochloride), which contains d-methamphetamine isomers. In his brief, Wooden raises the specter of impropriety by noting that Chavez's lab report identified the presence of small amounts of l-methamphetamine. As noted above, though, l-methamphetamine is also an optical isomer of methamphetamine, so it is still a controlled substance. And the government chose not to charge Wooden for any impurities, instead focusing on the overwhelming evidence of lab-grade, pure crystal meth he sold and possessed. There is no reversible error here.

### III

Finally, the district court did not err by permitting DEA chemist Louis Chavez to testify without procedural safeguards. Wooden contends Chavez testified as a "dual-role witness," or a witness who offered both expert and lay testimony at trial. *United States v. Bard*, 73 F.4th 464, 477 (7th Cir. 2023). If true, the district court should have followed the protocol outlined in *United States v. Jett*, 908 F.3d 252, 269–70 (7th Cir. 2018). Wooden did not object to this alleged dual-role witness problem at trial, so plain error review is appropriate. *Thomas*, 970 F.3d at 813.

A chemist discussing drug weights and testing results, however, testifies only as an expert witness—even when the chemist conducts the relevant tests and shares the results of that research at trial. *Cf. United States v. Gan*, 54 F.4th 467, 477 (7th Cir. 2022) (citing *Jett* as a case about "managing dual-role testimony from law enforcement"). The government properly certified Chavez as an expert and confined its questions to the tests he conducted on the drugs in this case. So, there was no risk of confusing or misleading the jury by suggesting Chavez was "privy to facts about the defendant not presented at trial." *Jett*, 908 F.3d at 267 (citation omitted). When expert chemists testify to their own examination of the relevant materials in drug cases, they are not fact witnesses. We decline to mandate *Jett* procedures in this context.[13]

---

[13] Wooden also argues that his right to a fair trial was violated because of cumulative error at his trial. But he did not establish any errors—much less the two errors needed to succeed with this challenge. *United States v. Edwards*, 34 F.4th 570, 588 (7th Cir. 2022).

**IV**

All methamphetamine is illegal under federal law. The plain text of 21 U.S.C. §§ 812 and 841 criminalizes the possession and distribution of methamphetamine, using the generic term instead of a specific chemical formula. Because Wooden offers no evidence that can disturb his conviction or sentence, the judgment of the district court is AFFIRMED.